# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-10-00460-CV

**Ralph Kelly, Appellant**

**v.**

**First State Bank Central Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT
### NO. 230,687-C, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

This suit involves a deficiency action against a guarantor of promissory notes following the non-judicial foreclosure sale of real properties securing the notes. *See* Tex. Prop. Code Ann. §§ 51.003, .005 (West 2007). Ralph Kelly, the guarantor, appeals from a final summary judgment in favor of First State Bank Central Texas, the lender, for the unpaid balances owed on the notes. In five issues, Kelly challenges the deficiency summary judgment against him based upon the doctrine of judicial estoppel and remaining issues of fact. Because we conclude that judicial estoppel does not apply and that First State conclusively established its claim for a deficiency judgment, we affirm the summary judgment.

### BACKGROUND

The underlying facts are not in dispute. Kelly's son Michael Kelly was the president of Primera Homes Corporation, a homebuilder. First State loaned money to Primera to finance the

construction of homes on two properties, the Cielo Circle Property and the Lariat Property. Primera executed a promissory note dated April 28, 2005, in the original principal sum of $488,750 ("Note 1"), secured by the Cielo Circle Property, and a promissory note dated November 9, 2005, in the original principal amount of $255,082 ("Note 2"), secured by the Lariat Property. Primera and First State executed security agreements, deeds of trust, and financing statements, and Ralph Kelly and his son executed personal guaranty agreements that secured the notes.

During the course of the loans, the parties also agreed to extend and modify the notes. The parties, including Kelly, executed the Third Modification of Note and Security Documents and the Fourth Modification of Note and Security Documents as to Note 1 and the Second Modification of Note and Security Documents as to Note 2.

In 2007, the notes matured and became due in full. Primera, however, defaulted on both notes, and, around that time, Kelly's son and Primera filed for bankruptcy protection. In the bankruptcy proceedings, First State moved to lift the automatic stay as to the Cielo Circle Property and the Lariat Property, contending that the debtors did not have equity in either property and that the properties were not necessary for an effective reorganization. *See* 11 U.S.C.A. § 362(d) (West Supp. 2010). To support its motions, First State filed an affidavit from its president and appraisals of the properties. The president averred that, "[b]ased upon appraisals performed by the Bank," the bank "believes the fair market value of the Cielo Circle Property to be $620,000 [and] the fair market value of the Lariat Property to be $262,000." First State also listed the outstanding existing lien

2

claims on the two properties, including the amounts of its own lien claims.[1] The total amount of the existing lien claims exceeded First State's represented fair market value for each of the properties. The bankruptcy court granted First State's motions and lifted the automatic stay.

After the automatic stay was lifted, First State noticed and then sold the properties at a non-judicial foreclosure sale in November 2007. At the foreclosure sale, First State purchased the properties by bids in the amounts of $468,000 and $185,000, for a combined total of $653,000. First State then brought this deficiency action in July 2008 against Kelly.

---

[1] In its motion to lift the automatic stay in the Primera proceeding, First Bank listed the following outstanding liens on the properties:

Cielo Circle Property:

| | |
|---|---|
| First State Bank Central Texas as of 8/10/07 | $500,742.88 per diem $131.79 |
| Cambridge Custom Homes | $ 48,000.00 |
| Floors, Inc. | $ 1,100.00 |
| InterCrete, LLC | $ 5,000.00 |
| Windsor Stucco Company | $ 79,000.00 |
| Durango Doors, LLC | $ 270.00-removable |
| Ad Valorem Taxes (2006) | $ 5,469.11 |
| | |
| Total: | $639,581.99 |

Lariat Property:

| | |
|---|---|
| First State Bank Central Texas as of 8/10/07 | $254,670.39 |
| Accrued & Unpaid Interest | $ 1,501.86 per diem $71.51 |
| Jimmy Evans Company | $ 57,744.86 |
| Burrows Cabinets | $ 7,333.33 |
| Shanrock Holdings | $ 8,884.61 |
| Chasco Contracting | $ 83,632.45 |
| | |
| Total: | $413,767.50 |

*First State's Pleadings*

First State's deficiency action against Kelly sought to recover the unpaid balances owed under the notes after offsetting the foreclosure sale prices plus interest, attorney's fees, and costs. *See* Tex. Prop. Code Ann. § 51.003. Section 51.003(a) of the property code provides that a suit to recover a deficiency judgment against a guarantor may be brought when "the price at which real property is sold at a foreclosure sale . . . is less than the unpaid balance of the indebtedness secured by the real property." *Id.* § 51.003(a). Here, it is undisputed that the properties' foreclosure sale prices were below the unpaid balances of the notes.

*First State's First Motion for Summary Judgment*

First State filed a motion for summary judgment in March 2009 based upon Kelly's guaranties. Its summary judgment evidence included copies of the notes, the guaranty agreements, the modification and extension agreements, and affidavits from a First State officer and its attorney. The officer averred concerning the non-judicial foreclosure sale of the two properties and the combined deficiency on the notes after offsetting the foreclosure sale prices. He itemized the principal, unpaid interest prior to February 18, 2009, appraisal fees, late fees, insurance fees, and the per diem interest charge for each note:

> Note 1. After deducting the proceeds of the trustee's sale on November 6, 2007, and after adding interest calculated as of February 18, 2009:
>
> | | |
> |---|---|
> | Principal: | $13,043.47 |
> | Unpaid Interest ($6.06 per diem after 2/18/09) | $48,230.24 |
> | Appraisal fees: | $ 450.00 |
> | Late fees: | $ 15.00 |
> | | $61,738.71 |

4

Note 2. After deducting the proceeds of the trustee's sale on November 6, 2007, and after adding interest calculated as of February 18, 2009:

| | |
|---|---|
| Principal: | $ 66,670.39 |
| Unpaid Interest ($32.36 per diem after 2/18/09) | $ 33,571.09 |
| Insurance fees: | $ 1,858.27 |
| | $105,099.75 |

The officer further averred that, "[a]fter giving Defendants credit for all just and lawful offsets, credits and payments, the total balance, excluding attorney's fees . . . as of February 18, 2009 is $166,838.46." The attorney opined that "the amount of reasonable and necessary attorney's fees and attendant collection costs for the preparation and presentation of Plaintiff's entitlement to summary judgment [was] $5,354.74."

*Kelly's Pleadings, Responses, and Motion for Summary Judgment*

In response, Kelly filed an amended answer, a response to First State's motion for summary judgment, and a competing summary judgment motion. In his amended answer, Kelly pleaded, among his defenses, that judicial estoppel barred First State's deficiency claim, that the "fair market value of the property, by Plaintiff's own admission, was greater than the foreclosure sales price," and, alternatively, sought an offset based upon the properties' fair market values pursuant to section 51.003(c) of the property code. *See* Tex. Prop. Code Ann. § 51.003.

In his response to First State's motion for summary judgment, Kelly argued that there were fact issues concerning the properties' fair market values and that judicial estoppel barred First State's claims. His competing motion for summary judgment also was based upon judicial estoppel. In both his response and his motion, he contended that First State was bound to the

5

properties' combined fair market value of $882,000, as represented to the bankruptcy court, and, because this value was greater than the combined unpaid balances owed on the notes, that First State was not entitled to a deficiency judgment against him as a matter of law. Kelly's summary judgment evidence included First State's motion to lift the automatic stay in the Primera bankruptcy proceeding, the affidavit of First State's president in support of the motion to lift the automatic stay, and the bankruptcy order granting First State's motion. After a hearing in October 2009, the trial court denied Kelly's motion for summary judgment. First State's motion for summary judgment remained pending.

*First State's Second Motion for Summary Judgment*

First State filed a second motion for summary judgment in December 2009 "to be heard concurrently" with its first motion. In its second motion, First State urged that, as a matter of law, Kelly contractually waived his statutory right "to challenge the resulting deficiency balance by calling into question the fair market value of the real property." First State's evidence included a copy of the Third Modification of Note and Security Documents. This document, as well as other modification documents for both notes, contains the following waiver provision:

> To the maximum extent permitted by applicable law, each of the Obligors hereby waives all rights, remedies, claims, and defenses based upon or related to Sections 51.003 and 51.004 (and as to Guarantors, also Section 51.005) of the Texas Property Code.

The modification documents define "Obligors" as the borrower and the guarantors. Kelly signed each of these documents.

6

*Kelly's Response*

Kelly responded to First State's second motion for summary judgment with evidence: (i) First State's motions to lift the automatic stay in the Primera and Michael Kelly bankruptcy proceedings with First State's supporting affidavits, (ii) the bankruptcy orders granting the motions to lift the automatic stay, (iii) appraisals of the Cielo Circle Property and the Lariat Property, and (iv) an affidavit by Kelly. In his affidavit, Kelly averred that he was not involved with the negotiation of the note modifications, he was not represented by counsel, he did not know at the time that he signed the note modifications that he was waiving his statutory rights to have a jury decide the properties' fair market values in the event of a foreclosure, he did not oppose First State's motions to lift the automatic stay or attend the foreclosure sale based upon First State's representations to the bankruptcy court that "the Properties securing the notes were $620,000.00 and $262,000.00," and he "justifiably believed that there would be no deficiencies on these loans." He further averred that he would have opposed the motions to lift the automatic stay and "refinanced the loans and/or purchased the Properties" had he known that First State intended to purchase the properties at an amount less than their fair market values as represented to the bankruptcy court.

*The Trial Court's Disposition*

After another hearing, the trial court granted summary judgment in favor of First State. The trial court rendered final summary judgment in the amount of $166,838.46 as the amount due and owing as of February 18, 2009; $13,639.10 as additional prejudgment interest from February 18, 2009, until judgment; $5,354.74 for attorney's fees; $215.00 for costs of court; and

7

postjudgment interest at the rate of five percent per year. Kelly filed a motion for new trial which was overruled by operation of law. This appeal followed.

## ANALYSIS

Section 51.003(c) of the property code sets forth two values by which a deficiency may be calculated: (1) fair market value as of the date of foreclosure, and (2) the foreclosure sale price. Tex. Prop. Code Ann. § 51.003(c). "If no party requests the determination of fair market value or if such request is made and no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency." *Id*. A guarantor against whom a deficiency judgment is sought, however, may request a determination of the property's fair market value as of the date of the foreclosure sale and, if the fair market value is greater than the foreclosure sale price, the guarantor is "entitled to an offset against the deficiency in the amount by which the fair market value . . . exceeds the sale price." *Id*. § 51.003(b), (c) Section 51.003(b) further provides that the "fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value." *See id*. § 51.003(b).

Kelly does not dispute that First State's evidence conclusively established that Kelly personally guaranteed the notes, that he signed note modification documents with contractual waiver provisions, that the notes matured and became due in full, that Primera defaulted on the notes, that the properties were properly noticed and sold at a non-judicial foreclosure sale, or that First State successfully bid on the properties for a combined amount of $653,000, resulting in a deficiency claim if the combined foreclosure sale price determines the deficiency. *See id*. § 51.003; *Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720–21 (Tex. App.—San Antonio 2004, no pet.) (to

8

recover under guaranty contract, party must show (1) existence and ownership of guaranty contract, (2) terms of underlying contract by holder, (3) occurrence of conditions upon which liability is based, and (4) failure or refusal to perform promise by guarantor).

Kelly's issues focus on whether First State may pursue its deficiency suit against him at all based upon the doctrine of judicial estoppel and whether fact issues remain to preclude summary judgment.

### Standard of Review

Kelly's issues challenge the trial court's summary judgment. We review summary judgments de novo. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661. When the parties file competing motions for summary judgment, and one is granted and one is denied, we review the record, consider all questions presented, and render the decision the trial court should have rendered. *Id*.

### Judicial Estoppel

Kelly's first and third issues are based upon the doctrine of judicial estoppel. Kelly contends that First State's sworn representation to the bankruptcy court that the properties' combined

9

fair market value was $882,000—an amount greater than the unpaid balances on the notes—precludes First State's deficiency suit against him as a matter of law, and, therefore, that provisions in the loan documents waiving his statutory rights to a fair market valuation and offset under section 51.003 of the property code are irrelevant. Kelly urges that First State's representation to the bankruptcy court "was tantamount to a representation that no grounds for a deficiency judgment against guarantor Kelly existed." By purchasing the properties at the foreclosure sale by credit bid, Kelly further urges, First State received full value for the unpaid balances on the notes so that any further recovery would be unjust and a double recovery.

Because Kelly raises judicial estoppel in the context of First State's position in prior bankruptcy proceedings, we apply federal law to our analysis of the issue. *See Dallas Sales Co. v. Carlisle Silver Co.*, 134 S.W.3d 928, 931 (Tex. App.—Waco 2004, pet. denied); *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 841–42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Under federal law, judicial estoppel is an equitable doctrine that protects the integrity of court proceedings by preventing "'a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). The doctrine generally applies when the position of the party to be estopped is "clearly inconsistent" with its previous position and the party successfully persuaded the court to accept that position, "so that the judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or second court was misled.'" *Id.* at 750–51.

To support his position, Kelly relies upon cases in which a bankruptcy debtor was judicially estopped from pursuing litigation claims that the debtor failed to disclose in the bankruptcy

proceeding. *See, e.g.*, *Reed v. City of Arlington*, 620 F.3d 477, 481 (5th Cir. 2010); *Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 333 (5th Cir. 2004). In *Reed*, the debtor violated bankruptcy law by "repeatedly misrepresent[ing] his assets and conceal[ing] from the trustee, the creditors, and the court his million dollar judgment." 620 F.3d at 482. The Fifth Circuit applied judicial estoppel to bar the debtor from pursuing the undisclosed judgment, noting that the failure to do so in that instance "would send debtors the message that they 'should consider disclosing personal assets only if [they are] caught concealing them.'" *Id.* at 482–83 (citation omitted).

Similarly, in *Superior Crewboats*, the court found that judicial estoppel precluded the debtors from prosecuting a personal injury suit that was not timely disclosed in a prior bankruptcy proceeding, concluding that the debtors' positions in the bankruptcy court and personal injury suit were inconsistent:

> It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims* . . . . Thus, . . . , the [debtors'] omission of the personal injury claim from their mandatory bankruptcy filings is tantamount to a representation that no such claim existed.

374 F.3d at 335 (citation omitted, emphasis in original). In contrast with the bankruptcy debtors in these cases, however, First State, as a secured lender, did not violate bankruptcy law or have an affirmative duty to disclose to the bankruptcy court in its motion to lift the automatic stay its specific

11

intentions concerning the properties. *See* 11 U.S.C.A. § 362(d). Further, First State does not seek to change its representations or stated position to the bankruptcy court here.[2]

Kelly also misstates First State's substantive position to the bankruptcy court. Kelly contends that First State's motion to lift the automatic stay was successful "[b]ased upon representations that the Properties were worth more than the amounts owed." But, First State's position was converse: First State did not seek for the stay to be lifted based upon the properties being *worth more* than the unpaid balances on the notes but based upon the properties being *worth less* than the outstanding liens on the properties. First State argued that the properties were not necessary to an effective reorganization and that the debtors did not have equity in either property because "existing liens exceed the value" of the properties. First State listed the existing liens, provided evidence of the properties' fair market value, and sought a lift of the automatic stay "to permit [First State] to seek any or all of its statutory, contractual or other available remedies, specifically that [First State] be permitted to accelerate the indebtedness, if necessary, post the properties for foreclosure and foreclose the liens."

---

[2] To the extent Kelly relies upon cases in which judicial estoppel applied to the valuation of property in bankruptcy based upon a bankruptcy debtor's conflicting valuations, we find those cases inapposite. *See, e.g.*, *In re Victorian Park Assocs.*, 189 B.R. 147, 149–50 & nn.3, 4 (Bankr. N.D. Ill. 1995) (concluding that no basis for applying judicial estoppel to debtor's changing position in that case as to value of property over time but noting "judicial estoppel might be applicable to valuation of property in bankruptcy" where "a party argues that an earlier valuation was wrong"); *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207, 210–11 (Bankr. E.D.N.Y. 1994) (finding debtor judicially estopped from asserting lower value of property in bankruptcy proceeding in which debtor had previously asserted significantly higher value for property and noting that denied creditor's motion to lift automatic stay "[b]ased in no small part on the debtor's evidence" of value and that debtor's "current position is grossly inconsistent with its prior position"). First State does not argue that its represented fair market values to the bankruptcy court were wrong and continues to stand by its representations here.

We conclude that First State's substantive position to the bankruptcy court—that the properties were not necessary for a successful reorganization and that the debtors did not have equity in the properties based in part upon the represented properties' fair market values—does not conflict with this deficiency suit against Kelly based upon the foreclosure sale prices. *See* Tex. Prop. Code Ann. §§ 51.002, .003. Further, the bankruptcy court's presumed acceptance of First State's substantive position and the trial court's acceptance of First State's position here—that First State conclusively proved its deficiency claim based upon the properties' foreclosure sale prices—do not create a perception that either court was misled. *See Maine*, 532 U.S. at 750–51; *see also In re Saunders*, 112 B.R. 844, 845 n.4 (Bankr. W.D. Tex. 1990).[3]

Kelly also argues that allowing First State to recover a deficiency judgment would be unjust. In his affidavit, Kelly averred that he would have opposed the motion to lift the automatic stay or "refinanced the loans and/or purchased the Properties" if he had known that First State planned to bid below the properties' fair market values. But Kelly does not seek to set aside the foreclosure sale, and, once the automatic stay was lifted, First State was under no obligation to

---

[3] Addressing non-judicial foreclosure sales, the *Saunders* court noted:

> As one might expect, rarely is there truly competitive bidding at a nonjudicial foreclosure sale. Typically, the lender is the only bidder. Other persons potentially interested in the property will often negotiate with the lender for the purchase of the property only after the fact, and frequently on financing terms offered by the lender. This is so at least in part because foreclosure sales are expected to be consummated for cash on the date of sale. Lenders are chary about "financing" a foreclosure purchase lest they be accused of collusion, and are equally unwilling to accept less than cash from a third party, lest the third party default after the fact, leaving the lender to absorb the loss.

*In re Saunders*, 112 B.R. 844, 845 n.4 (Bankr. W.D. Tex. 1990).

13

proceed with the foreclosure sale, to bid on the properties at the foreclosure sale, or, if it chose to do so, to bid only the fair market value. Texas law expressly allows a lender to purchase property at a foreclosure sale and then to seek a deficiency claim against a guarantor based upon the foreclosure sale price, without regard to the property's fair market value. *See* Tex. Prop. Code Ann. §§ 51.002. .003.[4]

First State also was under "no duty to take affirmative action, beyond that required by statute or deed of trust, to ensure a 'fair' [foreclosure] sale." *See Pentad Joint Venture v. First Nat'l Bank*, 797 S.W.2d 92, 96 (Tex. App.—Austin 1990, writ denied) (citation omitted) (evidence that lender knew but did not disclose its intentions to guarantors before foreclosure sale that it would bid below the fair market value did not void sale or preclude deficiency claim against guarantors based upon foreclosure sale price); *Biddle v. National Old Line Ins. Co.*, 513 S.W.2d 135, 138 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) (citation omitted) ("A mortgagee is obliged to conduct a sale fairly and not to discourage bidding by acts or statements made before or during the sale . . . . The mortgagee is bound not to 'chill the bidding' by word or deed before or during the sale, but is bound to conduct it fairly so as to produce as good a price as possible."). Given that First State's actions concerning the foreclosure sale were within its rights as a secured lender, we cannot conclude that allowing First State to proceed with its deficiency suit against Kelly would be unjust.

---

[4] Of course, section 51.003 of the property code limits a lender's ability to set the amount of its recovery against a guarantor in a deficiency suit by allowing an offset when requested by the guarantor based upon the property's fair market value at the time of the foreclosure sale. *See* Tex. Prop. Code Ann. § 51.003 (West 2007).

We conclude that judicial estoppel does not apply to bar First State's deficiency claim against Kelly and, therefore, that the contractual provisions in which Kelly waived his rights under section 51.003 of the property code are relevant. *See* Tex. Prop. Code Ann. § 51.003; *Maine*, 532 U.S. at 750–51. We overrule Kelly's first and third issues and turn to Kelly's challenge to the contractual waiver provision.

### *Contractual Waiver Provision*

In his fourth issue, Kelly challenges the contractual provisions waiving his statutory rights under section 51.003 of the property code. *See* Tex. Prop. Code Ann. § 51.003. Kelly argues, based upon section 51.003(b)'s requirement that the "finder of fact" determine fair market value, that the contractual provisions are unenforceable because they deprive him of a trial by jury or, at a minimum, that his affidavit raised a fact issue precluding summary judgment on whether he waived his constitutional right to have a jury trial. *See id.* § 51.003(b); Tex. Const. art. I, § 15; art. V, § 10. "[A] waiver of constitutional rights must be voluntary, knowing, and intelligent, with full awareness of the legal consequences." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 132 (Tex. 2004) (citation omitted). In his affidavit, Kelly averred that he was not represented by counsel, that he did not recall reading the waiver provision or any discussion of it, and that he did not know at the time that he signed the note modifications that he "was waiving any statutory rights to have a jury decide the fair market value in the event of a foreclosure."[5]

---

[5] To the extent Kelly argues that the waiver of his right to fair market valuation and offset should be set aside as a matter of equity based upon his averments that he was not represented by counsel or aware of the waiver when he signed the modification documents, Kelly fails to cite authority for this proposition. *See* Tex. R. App. P. 38.1(i). In any event, absent a showing of fraud

Based upon the plain language of the waiver provisions, however, they do not address Kelly's right to a jury trial but his statutory rights under the property code to a fair market valuation and offset following a foreclosure sale. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (contract terms are given "plain and ordinary meaning unless the instrument indicates the parties intended a different meaning")*.* Further, the right to a jury trial in civil cases is not absolute, and the summary judgment process allows cases to be resolved without a jury trial when no genuine issues of fact exist. *See Bliss v. NRG Indus.*, 162 S.W.3d 434, 437 (Tex. App.—Dallas 2005, pet. denied). When a party cannot show a material issue of fact, there is nothing to submit to the jury and the granting of summary judgment does not violate the constitutional right to a jury trial. *Id*. That is what happened here.

We also note that courts that have considered and analyzed guarantors' challenges to similar waiver provisions have upheld the provisions as enforceable and not against public policy. *See Segal v. Emmes Capital, L.L.C*., 155 S.W.3d 267, 279–80 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd); *LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F.3d 837, 841–42 (5th Cir. 2002). In *Sleutel*, the lender sought to recover a deficiency judgment against a guarantor after the lender purchased property at a non-judicial foreclosure sale for $750,000. 289 F.3d at 838–39. According to the guarantor, the property's fair market value was $1.6 million at the time of the foreclosure sale, and the guarantor sought an offset under section 51.003 of the property code based upon the property's fair market value. *Id*. The trial court granted partial summary judgment for the lender on the

---

or imposition, a party's failure to read an instrument before signing it is not grounds for avoiding it. *In re Bank of Am., N.A.*, 278 S.W.3d 342, 345 (Tex. 2009). Kelly has not asserted fraud or imposition here.

16

guarantor's offset claim on the ground that the guarantor contractually waived the right to valuation and offset and, on appeal, the guarantor challenged the waiver on public policy grounds. *Id*. at 840. The *Sleutel* court found persuasive the omission of language in section 51.003 precluding waiver to hold that a guarantor may contractually waive the rights set forth in that section. *Id.* at 841–42.

Consistent with the procedural posture in this case, the appeal in *Segal* was from a summary judgment against guarantors for the unpaid balances on promissory notes after offsetting the non-judicial foreclosure sale prices of properties securing the notes. 155 S.W.3d at 272–73. In that case, the guarantors challenged a contractual provision waiving their rights to a fair market valuation and offset under section 51.005 of the property code. *Id*. at 279–80; *see* Tex. Prop. Code Ann. § 51.005 (West 2007).[6] The waiver provision in *Segal* is substantively similar to the waiver provision here. It stated:

> To the maximum extent permitted by applicable law, [appellant] hereby waives all rights, remedies, claims and defenses based upon or related to Sections 51.003, 51.004 and 51.005 of the Texas Property Code, to the extent the same pertain or may pertain to any enforcement of this Guaranty.

*Id*. at 278. In affirming summary judgment against the guarantors, the *Segal* court cited and applied the same reasoning as the *Sleutel* court, noting that there were "at least 11 other instances within the Property Code, the Legislature has expressly stated that waivers of given rights, obligations, liabilities, exemptions, etc. are void or voidable, either categorically or under certain conditions,"

---

[6] Section 51.005 of the property code provides that a guarantor may bring an action for a determination of the fair market value of property after a foreclosure sale and seek an offset against a deficiency claim. Tex. Prop. Code Ann. § 51.005 (West 2007). Once a lender brings suit pursuant to section 51.003, this section does not apply. *Id*. § 51.005(a).

17

and that the Legislature did not include similar prohibitive language in section 51.005. *Id*. at 279. The court concluded that "[t]his omission indicates strongly that the Legislature did not find the protections afforded in section 51.005 to be so fundamental that they could not be waived contractually" and that the contractual waiver provision was enforceable and not against public policy. *Id*. at 279–80.

We agree with the analysis and conclusions in *Segal* and *Sleutel* that a guarantor may contractually waive his statutory rights to a fair market valuation and offset. We conclude that Kelly did so here. The trial court, therefore, did not err by determining the deficiency judgment based upon the undisputed evidence of the properties' foreclosure sale prices. *See* Tex. Prop. Code Ann. § 51.003(c). We overrule Kelly's issue challenging the contractual waiver provisions. Further, because we conclude that Kelly waived his statutory rights to a fair market valuation and offset, the properties' fair market value is immaterial to the deficiency determination, and we need not reach Kelly's issue in which he contends that he raised a fact issue on the properties' fair market value. *See Segal*, 155 S.W.3d at 284 ("Because [guarantors] validly waived their rights to seek a fair-market-value determination and an offset, it is immaterial whether [the guarantors] raised a fact issue on the three properties' fair-market value.").

### *Amount of the Deficiency Judgment*

In his fifth issue, Kelly contends that, even if the foreclosure sale prices were the correct measure for determining the deficiency judgment, the trial court incorrectly calculated the remaining balance and interest owed under the notes, and he seeks a remand to correct the judgment's amount. But, "[a] lender need not file detailed proof reflecting the calculations of the

balance due on a note; an affidavit by a bank employee which sets forth the total balance due on a note is sufficient to sustain an award of summary judgment." *Scott v. Commercial Servs. of Perry, Inc.*, 121 S.W.3d 26, 29 (Tex. App.—Tyler 2003, pet. denied) (citing *Martin v. First Republic Bank, Fort Worth*, *N.S.*, 799 S.W.2d 482, 485 (Tex. App.—Fort Worth 1990, writ denied)).

First State's evidence included its officer's affidavit. The officer averred concerning the unpaid balances owed under the notes after offsetting the foreclosure sale prices, itemized accrued interest and incurred costs and fees, and the per diem interest charges. First State's officer averred that the unpaid interest was $48,230.24 on Note 1 and $33,571.09 on Note 2 as of February 18, 2009, and that the per diem interest charge was $6.06 per day on Note 1 and $32.36 per day on Note 2. Kelly did not present controverting evidence, and the trial court's award of "$166,838.46 as the amount due and owing as of February 18, 2009," tracks the officer's averred total amount, including principal, interest, and costs, that was due and owing as of that date. The trial court's award of $13,639.10 as additional prejudgment interest from February 18, 2009, until the date of judgment is also supported by the officer's averred amounts of per diem interest charges.[7] We conclude that First State's uncontroverted evidence supports the trial court's awards of $166,838.46 and $13,639.10.

As part of this issue, Kelly also contends that the trial court erred in its award of interest, urging that the statutory interest rate and the tolling provisions in sections 304.103 and

---

[7] Calculating interest for 355 days, the approximate time period between February 18, 2009, and the summary judgment hearing, by using First State's officer's averred per diem interest charge for each note equals the trial court's award of additional prejudgment interest:  ($6.06 per day * 355 days) + ($32.31 per day * 355 days) = $13,639.10.

304.104 of the finance code apply. *See* Tex. Fin. Code Ann. §§ 304.103, .104 (West 2006).

Section 304.103 provides that prejudgment interest is equal to the applicable postjudgment interest

rate at the time of the judgment, and section 304.104 of the finance code provides in relevant part:

> [P]rejudgment interest accrues on the amount of a judgment during the period
> beginning on the earlier of the 180th day after the date the defendant receives written
> notice of a claim or the date the suit is filed and ending on the day preceding the date
> judgment is rendered. Prejudgment interest is computed as simple interest and does
> not compound.

*Id.* § 304.104. Based upon sections 304.103 and 304.104, Kelly argues that he is not liable for any

interest post-maturity until at least the date suit was filed, and that any interest accrued at five percent

from that point forward. *Id.* §§ 304.103, .104. Kelly further contends that the guaranty agreements

must be strictly construed in his favor and that his guaranties do not contain contractual obligations

for the payment of post-maturity interest. *See Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464 (Tex.

1991) ("Texas courts apply the rule of *strictissimi juris* in interpreting guaranty agreements to refrain

from extending the guarantor's obligation by implication beyond the written terms of the

agreement."); *McKnight v. Virginia Mirror Co.*, 463 S.W.2d 428, 430 (Tex. 1971) (same).

      The plain language of the loan documents executed by Kelly, however, supports

First State's claims for interest at the rates provided in those documents, including post-maturity

interest. *See Apache Corp.*, 294 S.W.3d at 168. Kelly's guaranty securing Note 1 provides:

> The indebtedness guaranteed by this Guaranty includes any and all of Borrower's
> indebtedness to Lender and is used in the most comprehensive sense and means and
> includes any and all of: Borrower's liabilities, obligations and debts to Lender, now
> existing or hereinafter incurred or created, including without limitation, all . . .
> interest . . . .

20

The Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness.

The guaranty securing Note 2 similarly provides:

[Kelly] guarantees to Lender the prompt and full payment of the Guaranteed Indebtedness . . . , as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise, and at all times thereafter. . . .

The term "Guaranteed Indebtedness," as used herein, includes: (a) all sums now or hereafter due and owing pursuant to the terms of that certain Promissory Note . . . and the terms of the . . . Loan Documents; (b) interest on any indebtedness described in (a) preceding; . . . and (d) any renewal, extension or rearrangement of the indebtedness, costs, or expenses described in (a) through (c) preceding, or any part thereof.

Kelly also agreed in the loan documents modifying both notes that "[m]atured unpaid principal and interest shall accrue interest at the Maximum Rate."[8] *See also* Tex. Fin. Code Ann. §§ 303.001–.009 (West 2006). The plain language of the loan documents makes clear that Kelly was liable for interest on the note balances at the interest rates provided in those documents, including post-maturity interest. We overrule Kelly's fifth issue.

---

[8] The note modification documents define the maximum interest rate as the "highest rate of interest permitted by applicable law . . . ; provided the Maximum Rate shall not exceed 18% or the State usury ceiling, whichever is less."

**CONCLUSION**

Because we conclude that judicial estoppel does not apply and that First State's evidence conclusively established its claim for a deficiency judgment against Kelly, we affirm the summary judgment.[9]

_____

Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:　December 30, 2011

---

[9] Pending before this Court are First State's motion for leave to file post-submission brief and its motion to file supplemental brief.　We grant both motions.